## JAMES H. WOODBURN

### v.

## PHŒBE A. WOODBURN AND PETER EGE.

*Wills—Annuity—Contracts—Correction—Trust Fund—Interest*—Dona-
tio Causa Mortis—*Waiver of Legal Right, a Sufficient Consideration—
Mistake—Consolidation of Causes in Equity.*

1.  Upon a writ of error to review a decree entered by the court below,
touching the rights of the parties under a will and certain transactions
affecting the property devised, it is *held:*  That the various suits pending
in the court below were properly consolidated; that the contract, whereby
the widow relinquished a portion of her annuity under the will, was sup-
ported by a sufficient consideration, the waiver by her step-son of his claim
of ownership in his own right of the property involved; that she is entitled
to the correction of a mistake in said contract, limiting her annuity to the
interest on a certain sum; that she is not entitled to the surrender of her
notes, held by the trustee as part of the principal sum directed by the will
to be raised and invested, and from the interest on which said annuity is to be
paid; that in no event can she be allowed to convert any part of the princi-
pal of said trust fund to her own use, others being entitled thereto subject to
her life interest; that her remedy for any failure of the executor to pay her
annuity, is against him or upon his bond; that the claim that a certain note
was a *donatio causa mortis* is not sustained by the evidence; that a mistake
in a mortgage securing said notes of the widow should be corrected; and
that the cross-error of the executor is not well assigned, there being no
cross-bill asking for relief.

2.  Upon a motion to consolidate suits in equity, the only inquiry is in
respect to the identity of the subject-matter involved.   Such a motion is ad-
dressed to the discretion of the court, and courts of error will not interfere,
unless it is clear such discretion has been greatly abused.

3.  The waiver of any legal right, or the compromise of a doubtful right,
is a sufficient consideration to support a contract.

4.  A *donatio causa mortis* must be supported by clear and convincing
evidence.

[Opinion filed June 20, 1887.]

IN ERROR to the Circuit Court of Whiteside County; the
Hon. JOSEPH M. BAILEY, Judge, presiding.

George W. Woodburn died testate on the 19th day of July,

1872, and left him surviving an only child, James K. Woodburn, his son by a deceased wife, and Phœbe A. Woodburn, his widow; and by his last will and testament he appointed Peter Ege as his executor.

Peter Ege qualified and took upon himself the duties of the trust. One of the provisions of the will was as follows:

"I hereby will, direct and request, and by this, my last will, do place in the hands of my executor all my real estate, being the farm upon which I live, and do direct him to sell what may be necessary for the payment of my debts; also to sell an amount sufficient to raise a fund sufficient to pay of interest to my beloved wife, Phœbe Ann Woodburn, $1,000 per year, which amount shall be for her support during her lifetime, and at her death this fund shall go to my legal heirs in the order below mentioned, that is to say, to my son, James H. Woodburn, if living, for his use during his lifetime; at his death to go to his children, and at their death, if childless, to go to and be divided among the families of my brother, William H. Woodburn, John M. Woodburn and Jane E. Ege."

The executor, for the purpose of creating the fund provided for in the will, advertised the real estate for sale on the 13th day of March, 1873, and on the morning of that day Phœbe A. Woodburn and James H. Woodburn entered into an agreement with reference to the sale of the lands, and a reduction in the amount of the interest to be paid to the former.

There is a conflict in the testimony upon the point whether the agreement in writing and under seal, and witnessed by the executor, was executed upon the morning of the 13th, or was written out on the next day by James H. Woodburn, in supposed conformity with the verbal contract and agreement of the 13th, and upon said next day antedated and signed by the parties. This writing, after reciting the provision made by the will for the support, during her lifetime, of Phœbe A. Woodburn, proceeded as follows: "And whereas there appears to be a cloud upon the title of said real estate, by reason of claim set up by James H. Woodburn, said party of the

second part, second legatee under said will, therefore in consideration of the sum of $1 in hand paid, the receipt whereof is hereby acknowledged, and for the further consideration that the said party of the second part shall join in making a clear title to said real estate, the said Phœbe A. Woodburn, party of the first part, does waive and relinquish, in favor of said James H. Woodburn, party of the second part, all the interest of said fund except the interest on the sum of $8,000 per annum."

The thirteenth finding of fact reported by the master in chancery to the court was: "That the agreement made March 13, 1873, between James H. and Phœbe A. Woodburn, in fact was, that Phœbe A. Woodburn would accept $800 per year during her life." In conformity with the arrangement made, James H. Woodburn publicly announced at the sale and before the bidding, that the differences between Mrs. Woodburn and himself had been adjusted, and that he would' sign a quit-claim deed to whoever bought the property.

At the sale made by the executor, James H. Woodburn purchased real estate to the amount of $15,150. The day after the public sale he sold to Phœbe A. Woodburn that part of the land bid off by him, upon which the dwelling house stood, for the sum of $2,180; but by mistake the deed executed by him and his wife to his step-mother described the wrong premises. This $2,180 was included in promissory notes, bearing ten per cent. interest, executed by Phœbe A. Woodburn to Peter Ege, the executor, and secured by a mortgage made by her to him, which mortgage was intended to be upon the dwelling house premises, but the same mistake that was made in the description contained in the deed, was also made in the mortgage.

It was the arrangement between the parties that this $2,180 should be held by Ege, the executor and trustee, as a part of the fund directed to be created by the will of George W. Woodburn, deceased. Prior to the death of George W. Woodburn he held a promissory note for $3,050 dated February 26, 1871, executed to him by James H. Woodburn. Ege, the executor, inventoried this note as part of the assets of the estate; and in his report to the County Court of May 18, 1875, he charged and was allowed $90 commission thereon.

This note was delivered up and surrendered by the executor to James H. Woodburn, the maker; but at what date this was done is uncertain from the testimony.   The evidence of Ege, with reference to the alleged donation of this note, was as follows :

"Mr. Woodburn handed the $3,050 note to me during the time his will was being prepared.   It was during the time he was giving me instructions about his will before the will was signed.   It was handed to me on the day I drew these drafts of the will.   Mrs. Phœbe A. Woodburn was present; I do not remember any one else.   Mrs. Woodburn got his pocket-book out of a closet or trunk, or something in the corner of the room, as I now remember.   She went and got the pocket-book and handed it to him; he was raised up in bed; he looked it over and asked me some questions about it, and then gave it to me and I passed it to Mrs. Woodburn, who put it in his pocket-book and put it back in the same closet or trunk.   I think she was called for the purpose of getting the note.   Mr. Woodburn asked me if I thought the note was collectible.   I asked him what it was given for; he went on and gave me quite an extended history of it.   I told him that it was a question in my mind that I was not able to answer whether it could be collected at law or not.   He handed me the note back after these questions were settled, and' told me, 'if James Woodburn does not contest the will you give him the note ; if he contests the will you collect it for Mrs. Woodburn's benefit.' I think he added that it might be possible that James would claim title to the place.   I handed it to Mrs. Woodburn, and said, 'Aunt, put it away safely,' or something like that.   I believe she replied, 'We will put it where we have always kept it. '"

The testimony of Phœbe A. Woodburn in regard to the matter, was as follows:

"I recollect about a $3,000 note that my husband held against James Woodburn.   I was in the house when Colonel Ege was making a draft of the last will and testament of my late husband.   During the time that Colonel Ege was writing the will I did not have that note in my hands.   I never saw

Woodburn v. Woodburn.

Colonel Ege write the will. I did not hand that note either to my husband or Colonel Ege. The note was kept with his other papers in a trunk in the closet that led out of the sleeping room. It was there, so far as I knew anything about it. I never delivered that note to Colonel Ege. He obtained it in that trunk where Mr. Woodburn kept his papers if he ever obtained it. He asked me after his uncle was buried for all his papers. He said, as executor, he must have all the papers that his uncle left; I told him where they were and I think I helped him bring the trunk out of the closet and bed-room into the sitting-room. I told him all the papers I knew of were there; his uncle was very particular and kept all his papers in that trunk. I think I helped him to take the trunk up-stairs; he said it would take him several days to look over and attend to what he wanted to with the papers, and he would take it in a room where he would be by himself, and not subject to any one coming in to interrupt him. It was not a very large trunk, but still more convenient for two persons than one to carry. I never saw that note from that day to this. I never directed Colonel Ege to give it to James Woodburn."

At the December term, 1880, of the Circuit Court of Whiteside County, there was pending in that court the following causes, to wit: A bill in equity wherein James H. Woodburn was complainant and Phœbe A. Woodburn and Peter Ege were defendants; a cross-bill wherein Phœbe A. Woodburn was complainant and James H. Woodburn and Peter Ege were defendants; an original bill filed by Phœbe A. Woodburn against Peter Ege for an accounting, and for the appointment of a receiver; also the case of an appeal from an order of the County Court made in the matter of the estate of George W. Woodburn, deceased, and also the case of another appeal from the County Court, it being the matter of the final report of Peter Ege, executor of George W. Woodburn, deceased. The court, upon motion of the solicitors for Phœbe A. Woodburn, ordered all these several causes to be consolidated. Among other things decreed by the Circuit Court upon the hearing, it was adjudged that the agreement between James H. Woodburn and Phœbe A. Woodburn, dated March

13, 1873, was made without any good and valuable considera-
tion, and that it was on the 13th day of December, 1887,
repudiated by said Phœbe A. Woodburn, and it was ordered
that from such latter date it should be null, void and for
naught for all purposes subsequent to such date.

It was also decreed that Peter Ege release and discharge
the mortgage made by Phœbe A. Woodburn to him, and that
the notes of said Phœbe A., payable to said Ege, and to secure
which the mortgage was made, should be surrendered up to
said Phœbe A. The court found that there was due from the
executor to the estate of the deceased the sum of $8,604.52 and
it was decreed that Peter Ege pay over the said sum to the
receiver within thirty days, and that in default thereof that
the receiver have execution therefor. It was further decreed
that there be paid to Phœbe A. Woodburn out of the estate,
$2,859.78, of which sum $2,180 should be paid by the surrender
to her of her promissory note in the hands of the clerk of the
court. And the receiver was ordered to re-invest the sum of
$2,180 when collected from said Ege, as a part of the fund of
said real estate. The remaining provisions of the decree of
the court it is unnecessary to mention.

The plaintiff in error, James H. Woodburn, makes the fol-
lowing points for the reversal of the decree of the Circuit
Court, i. e.:

1st. The court below erred in decreeing a cancellation of
the contract entered into between James H. Woodburn and
Phœbe A. Woodburn, whereby she agreed to take the interest
upon $8,000, instead of the interest on $10,000, as provided for
in the testator's will.

2d. The court erred in ordering a release of the notes and
mortgage made by Phœbe A. Woodburn to Peter Ege as
executor of the last will and testament of George W. Wood-
burn, deceased, and thereby diminishing the trust fund created
by the will of the testator.

3d. The court erred in consolidating the four cases, and
trying them together as one case, against the objection of the
plaintiff in error.

4th. The court erred in not holding that the promissory

note made by James H. to George W. Woodburn, and delivered by George W. Woodburn in his lifetime to Peter Ege, to be by Ege surrendered to James H., was a proper *donatio mortis causa.*

5th. The court erred in decreeing a judgment against Peter Ege on the promissory note made by James H. Woodburn to George W. Woodburn.

It is also urged by Peter Ege, by way of cross-error, that the court erred, after having rendered a decree that the note of James H. Woodburn was not a *donatio causa mortis*, in not decreeing that said James H. Woodburn should pay the amount of said note instead of the defendant Ege.

The other facts of the case that are necessary for an understanding of the decision are sufficiently stated in the opinion of the court.

Messrs. C. J. JOHNSON and O. F. WOODRUFF, for plaintiff in error.

Mr. PETER EGE, in person.

BAKER, P. J. The third point relied upon for reversal is preliminary in its character, and will for that reason be first considered. The point urged is that it was error to order the consolidation of the four causes that were pending in the Circuit Court, and the reason given is that James H. Woodburn, plaintiff in error, was not a party to several of these contentions.

The authorities cited by plaintiff in error, 1 Tidd's Practice, 614, and Miles v. Danforth, 37 Ill. 156, have no application to the case at bar. The rule stated by Tidd has reference only to actions at law which are depending at one time, and the rule of the law court is that actions will not be consolidated except when they are for causes of action which may be joined and are by the same plaintiff and against the same defendant. In *Miles* v. *Danforth*, two actions in case on promises were pending, in one of which Almon G. Danforth was plaintiff and in the other Asa H. Danforth and George W.

Danforth were plaintiffs; and when the court remarked that when a case can not be found where actions brought by different plaintiffs have been consolidated, they, as matter of course, had reference only to actions at law. When a motion is made to consolidate suits in equity a wholly different test is applied, and the only inquiry is in respect to the identity of the subject-matter involved.

The aim of the chancery court is to bring in all parties in interest, and in order to accomplish this object it will consolidate suits wholly regardless of the identity of the parties plaintiff and defendant. Here the pending contentions were all either based upon bills in chancery or were appeals taken from the orders and decrees of the County Court in the matter of the settlement of the trust estate and therefore necessarily involving questions of equity jurisdiction. The matters in litigation in all the suits grew out of and had reference to the administration of the trust fund in the hands of the executor and trustee.

The doctrine is, that a motion to consolidate is always addressed to the direction of the trial court, and that courts of error will not interfere unless it is plain that the discretion given has been greatly abused. In this particular case we think the action of the court was eminently proper; all the parties were interested in all the issues, and the several litigations were so interwoven that they could not well have been tried separately.

2. The cross-bill of Phœbe A. Woodburn sought to set aside and annul the agreement that was made on the 13th of March, 1873, between herself and James H. Woodburn, on the ground of fraud and of a conspiracy between the latter and Ege, by means of which she was cheated and defrauded. The court granted the relief that was desired, but granted it upon the express and only ground that the agreement was made without any good and valuable consideration.

Waiving the question of a variance, we are of opinion the evidence did not sustain the finding of the court, and that the decree entered in regard to the matter of this agreement was erroneous.

The evidence shows that on the 3d day of July, 1848, one James C. Woodburn executed to one John Galt a deed conveying to him in trust 220 acres of land, said land including the real estate and farm which was afterward directed to be sold by the will of George W. Woodburn, deceased.

The deed recited that the grantor held the title in fee simple, but that the lands had been purchased from the general government with moneys advanced to him for that purpose by Agnes Woodburn, the mother of George W. Woodburn, and that the directions of said Agnes were that one-half of said investment was to belong to James H. Woodburn, the sole heir of George W. Woodburn, and the other half to remain in the hands of some suitable person for other heirs of said George W. Woodburn, should he have any such, otherwise to belong to the said James H. Woodburn also, and that the net proceeds belong to James H. Woodburn in full as long as he is sole heir.

The avowed object in making the conveyance was "for the purpose of placing the title to these lands in the hands of John Galt for the use of said heir or heirs of G. W. Woodburn."

Under date of July 16, 1848, George W. Woodburn wrote to his son, James H. Woodburn, as follows: "I had Mr. Galt appointed guardian for you and a deed in trust made to him for the land; he holds the land according to mother's direction thus: the half to you absolute and the other half to you at my decease, if I should have no more heirs, but in case of other heirs to be theirs; in the meantime the net profits to be yours." Under date of November 1, 1855, he wrote to his son, among other things, this: "Should I become enfeebled and helpless, my mother said my living or support should be secured off the land, and that is the amount of interest I have in it." On the 23d day of November, 1871, some eight months prior to his death, George W. Woodburn filed in the Whiteside Circuit Court, his bill for partition, in which he claimed to be seized in fee simple of the one equal and undivided half part of the lands that were deeded to John Galt in trust, and made James H. Woodburn, Susan Wood-

burn, wife of James H., and one Thomas Gifford, parties defendant. No name was interposed in this suit, and at the March term, 1872, a decree was entered therein finding that George W. Woodburn was entitled in fee to one equal undivided half part of the premises, and that James H. Woodburn was entitled to a like one equal and undivided half part.

Thereupon the commissioners appointed by the court made partition, and a final decree was entered that the parties hold in severalty the shares set off and assigned to each respectively, and that the title to said shares should be vested in the parties respectively, according to the assignment.

It is submitted by counsel for Phœbe A. Woodburn that the title to the land was adjudicated upon in this suit for partition, and that plaintiff in error is estopped to deny that George W. Woodburn was seized in fee of the premises mentioned in his will.

This undoubtedly is the present *status* of the matter. But, at the time the agreement of March 13, 1873, was made, James H. Woodburn was entitled, as matter of absolute right, to his writ of error to bring before the Supreme Court the record in the partition proceeding and to have the decree reversed in the event that court found there was manifest error. Nor was he at that time precluded or estopped from filing in the Circuit Court a bill in the nature of a bill of review for the purpose of impeaching the decree of partition for fraud or mistake. It is wholly immaterial to the present inquiry whether there was or was not error in the partition record, or whether there was or was not good and sufficient ground for impeaching the decree. In any event, James H. Woodburn, at least, had the right to seek to get relief from the decree.

He was setting up a claim of ownership in his own right to the land which the will directed should be sold. So far as appears from the record, the title of the testate to the land rested wholly upon the partition proceedings, in and by which it had been awarded and adjudged to him. It is very evident from numerous statements made in the will and from the penalties and forfeitures provided for therein, that the testa-

Woodburn v. Woodburn.

tor was fearful that after his decease the son would attempt, by law, to claim the land.

The evidence tends strongly to show that the title of the testator was questioned by the public and by the prospective bidders.

Even if it were conceded that plaintiff in error did not have a good or valid claim to the land, yet that would not alter the case.

The waiver of any legal right is a sufficient consideration to support a contract, so, also. is the compromise of a doubtful right, and it is immaterial in such case on whose side the right ultimately turns out to be. McKinley v. Watkins, 13 Ill. 140; Miller v. Hawker, 66 Ill. 185; Honeyman v. Jarvis, 79 Ill. 318.

We find no evidence in the record of fraudulent representations to induce the execution of the contract. According to Phœbe A. Woodburn's own version of the transaction, the step-son merely stated he had papers in his possession with which he could hold the whole property. Perhaps this would properly be regarded as simply the expression of an opinion; but, even if not so regarded, that which he said would seem, from the evidence, to be literally true, provided he could secure a reversal on error, or a hearing by bill in the nature of a bill of review.

Mrs. Woodburn entered into an agreement to rebate $200 of her $1,000 annuity, in consideration that her step-son would release all claim to the land, and join in making a clear title to the purchasers, at the executor's sale. It was plainly for her interest to have the title quieted, as thereby the lands would be likely to sell at the public sale for their value, thus enabling the executor to secure a fund sufficient in amount to produce her annuity.

The real estate might not have been disposed of for a sufficient sum to accomplish this, had not the cloud been removed from the title. Rather than take the risk, Mrs. Woodburn abated $200 of her annuity; and no one can say that the abandonment of his claim by plaintiff in error, was not worth to her all that it cost her. It should also be borne in mind that she for many years had received and still continues to

receive the benefits of her contract, and that she, for a long while, acquiesced in the agreement, and did not repudiate it until December, 1877, nearly five years after it was made; and that when she so repudiated her agreement, the time had passed wherein plaintiff in error could sue out a writ of error in the partition suit, or present a bill to set aside the decree therein for fraud or mistake.

We think the decree declaring the agreement of March 13, 1873, null and void, was erroneous. We are satisfied from the evidence, however, that the abatement that was agreed upon by the parties was $200 of the $1,000 annuity, and that it was not the understanding that the abatement should be all of the annuity, except the interest that should be produced by $8,000, without regard to the rate of interest. The will gave to Mrs. Woodburn $1,000 without reference to the rate of interest or the amount of money that should be put at interest. The proposition agreed upon, according to the testimony of plaintiff in error himself, was to "throw off from the interest $200 a year." The testimony of all the witnesses, with reference to what transpired, and the subsequent conduct of the parties and their statements, made in various writings, clearly show that when plaintiff in error drew up the agreement in writing, he, by mistake, instead of using the words, "except $800 per annum," inserted the words "except the interest on the sum of $8,000 per annum." Probably the mistake was the more readily made, and more easily overlooked, from the fact that at that time the usual rate of interest upon moneys loaned was ten per centum per annum.

The evidence shows that Mrs. Woodburn was relying upon Ege, the executor and trustee, with reference to the writing, and signed it without examination.

We are inclined to take this view of the matter, rather than believe that the agreement was intentionally and fraudulently written in the form it was, by collusion between plaintiff in error and Ege. We think the written agreement should be corrected and reformed in the particular above pointed out.

3. The Circuit Court decreed that Peter Ege release and discharge the mortgage made by Phœbe A. Woodburn to

Woodburn v. Woodburn.

him, and also that the notes, to secure which the mortgage was made, should be surrendered to said Phœbe A. As we understand the testimony in the record, the trust fund directed by the will to be raised, as it was constituted by Ege, the executor and trustee, consisted of notes of James H. Woodburn, amounting to the principal sum of $8,753, which were secured by mortgages on real estate, and also of the sum of $2,180, included in promissory notes of Phœbe A. Woodburn, also secured by mortgage on real estate. By the terms of the will, Mrs. Woodburn, the life tenant, is only entitled to receive the interest on this $2,180, as a part of her annuity. She can only lay claim to such interest, and in no event should be allowed to convert to her use the principal sum of $2,180, and for the obvious reason, it is a part of the principal of the trust fund. The will, in express terms, provides that " at her death this fund shall go to my legal heirs, in the order below mentioned; that is, to my son, James H. Woodburn, if living, for his use during his lifetime, at his death to go to his children, and at their death, if childless, to go to and be divided among the families of my brother, William H. Woodburn, John M. Woodburn and Jane E. Ege."

So, it will readily be perceived there are other persons who have an interest in this fund who were not before the court in these chancery proceedings, and it was error in the court to confiscate their rights and equities and turn over a part of the principal of the fund to the first life tenant. Even if by the fraud or mismanagement of the trustee, or otherwise, she had not received the full benefit of the annuity she was entitled to have, and a part of the interest that should have been paid to her had been otherwise used or appropriated, yet this gave her no lien therefor upon the principal of the fund; her remedy was against the executor personally, or upon his bond. As the will gave her only the interest, it follows that if such interest has been squandered by the executor, the loss must fall on her rather than on the conditional residuary legatees.

It will not do to claim that this $2,180 was a personal debt due Ege, and that Ege had kept the moneys of Mrs. Woodburn until the debt was discharged and the house and premises

paid for. The evidence clearly shows it was a part of the principal of the trust fund, and Mrs. Woodburn fully and explicitly admits and states that fact both in her answer to the bill of complaint of James H. Woodburn and in her bill of complaint against Ege. The court below in substance found the same fact, and ordered the receiver to re-invest the sum of $2,180 when collected of Ege.

It is no sufficient answer to say that the court should collect this sum of $2,180 from the executor, and that when collected it should be re-invested as a part of the fund, to compensate for the part of the principal of that fund that has been applied to the payment of the annuities due Mrs. Woodburn. It might be, said sum never would be collected, either of the executor or his securities; and besides, this is not what the will directed to be done.

In our opinion, the decree of the court in regard to this matter was erroneous.

4. The claim of plaintiff in error that the promissory note for $3,050 was a good *donatio causa mortis* by the deceased to him, we think can not be maintained. Taking as true the testimony of Ege and of plaintiff in error in regard to the matter, it is at least very doubtful whether the gift is sufficiently made out. But, waiving that question, when we consider the fact that the note was found among the papers of the deceased after his death, that the executor inventoried the note as a part of the assets of his testate and charged commissions upon it, and that the testimony of Phœbe A. Woodburn, widow of the deceased, contradicts in every material point the facts as stated by Ege and plaintiffs in error, we are unable to hold that the case presents that clear and convincing evidence that the law requires in order to support a *donatio causa mortis*.

It was said by Chief Justice Tilghman in Wells v. Tucker, 3 Binney, 366: "Too much care can not be taken in insisting on the most convincing evidence in cases of this kind; for these donations do not, in effect, amount to a revocation *pro tanto* of written wills; and not being subject to the forms prescribed for nuncupative wills, they are certainly of a dangerous nature."

In his report made to the County Court in 1874, Ege, the executor, charged himself with this note for $3,050. The only question that was before the Chancellor on the hearing in reference to the note, was whether he should be credited therewith in his final report, on the ground it was a valid gift to plaintiff in error, and had been properly delivered up and surrendered to him, or should stand charged therewith in said report.

The cross-error of Ege is not well assigned. He filed no cross-bill asking for relief, and there was nothing within the scope of the allegations of the pleadings in the consolidated cause, that called upon or would have permitted the court to render a decree against plaintiff in error for the amount of the note either in favor of Ege, or Mrs. Woodburn, or the receiver.

We hold that the decree below was erroneous in these several respects, to wit:

1st. In decreeing a cancellation of the contract entered into between James H. and Phœbe A. Woodburn.

2d. In ordering the annuity of Phœbe A. Woodburn to be paid from and after the 13th day of December, 1877, upon the basis of $1,000 per annum.

3d. In ordering the notes of Phœbe A. Woodburn, in which were included the sum of $2,180, the same being a part and parcel of the principal of the trust fund, to be surrendered up to said Phœbe A.

4th. In decreeing that the mortgage given by said Phœbe A. to secure said $2,180, should be released and discharged.

And, in ordering, as incident to the last two items, that said $2,180 should be credited upon the amount due said Phœbe A. for unpaid annuities. The decree of the court in regard to these several matters thus enumerated, is reversed. In all other respects the orders and decree of the court are affirmed. And it is further ordered that the cause be remanded to the Circuit Court with these directions, to wit:

1st. To correct the mistake in the written agreement of March 13, 1873, by substituting the words "except $800 per annum," in the place and stead of the words "except the interest on the sum of $8,000 per annum."

2d. To order and decree that said Phœbe A. Woodburn be paid her annuity upon the basis of $800 per annum.

3d. To order and decree that the notes and mortgage given to secure said $2,180 be delivered to the receiver and trustee having charge of the trust fund; and

4th. To order and decree that the mistake made in said mortgage in the description of the land and premises mortgaged, be corrected so as to correspond with the description of said land and premises contained in the reformed and amended deed made by James H. Woodburn to Phœbe A. Woodburn.

<em>Affirmed in part and reversed in part.</em>